IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 13-cv-02428-RBJ

LINDA MARIE BROWN,

      Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration,

      Defendant.

---

## ORDER

---

      This matter is before the Court on review of the Commissioner's decision denying plaintiff Linda Brown's application for disability insurance benefits pursuant to Title II of the Social Security Act. Jurisdiction is proper under 42 U.S.C. § 405(g).

### STANDARD OF REVIEW

      This appeal is based upon the administrative record and briefs submitted by the parties. In reviewing a final decision by the Commissioner, the role of the district court is to examine the record and determine whether it "contains substantial evidence to support the [Commissioner's] decision and whether the [Commissioner] applied the correct legal standards." *Rickets v. Apfel*, 16 F.Supp.2d 1280, 1287 (D. Colo. 1998). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wilson v. Astrue*, 602 F.3d 1136, 1140 (10th Cir. 2010) (citations omitted). Evidence is not substantial if it "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

The Court "may neither reweigh the evidence nor substitute [its] judgment for that of the agency." *Harper v. Colvin*, 528 F. App'x 887, 890 (10th Cir. 2013) (citations omitted). Thus, although some evidence could support contrary findings, the Court "may not displace the agency's choice between two fairly conflicting views," even if the Court might "have made a different choice had the matter been before it de novo." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). However, the Court must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007) (citations omitted).

Upon review, the district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 45 U.S.C. § 405(g).

## PROCEDURAL HISTORY

Ms. Brown first applied for disability insurance benefits on December 21, 2010. She claimed inability to work since her alleged onset date of December 21, 2010 due to brain and nerve damage, fatigue, and blurry vision in her left eye. Ms. Brown continues to remain insured through December 31, 2014. The Commissioner denied Ms. Brown's application on March 2, 2011. Ms. Brown then requested a hearing before an administrative law judge (ALJ), and the ALJ conducted a hearing on June 11, 2012. On July 5, 2012, ALJ James A. Wendland issued an opinion denying benefits. The Appeals Council denied Ms. Brown's request for review on July 29, 2013. Thereafter, Ms. Brown filed a timely appeal with this Court.

## BACKGROUND

Ms. Brown was involved in a motor vehicle accident in June 2008.  She was immediately treated in the ER for a laceration on her head but was discharged the same day.  Two months later Ms. Brown began reporting daily headaches.  At that time her doctor opined that the accident resulted in closed head trauma and possibly a mild cerebral concussion.  In January 2009 Ms. Brown was diagnosed with mild traumatic brain injury and was prescribed medication used to treat nerve damage.  Ms. Brown currently suffers from traumatic brain injury with cognitive and emotional limitations, anxiety disorder, depressive disorder, disorder of the knees, and obesity.  R. 26.  Ms. Brown also suffers from headaches, right shoulder and neck strain, and a drooping eyelid.  *See* R. 27.  Ms. Brown has been prescribed medications for her depression and concentration issues.

### Medical Evidence

On June 14, 2008, Ms. Brown was involved in a motor vehicle accident when another motorist failed to stop at a red light.  R. 193–94.  She was taken to the emergency room at the University of Colorado Hospital where she was treated for a scalp abrasion, other scrapes and abrasions, and a wrist injury.  R. 293–97.  She was released the same day.  The next day Ms. Brown returned to work, but she was advised by her boss to return to the emergency room after complaining of feeling ill and suffering from a headache.  A CAT scan of the brain was done, and she was told she had "abnormal blood vessels."  *See* R. 260.[1]

On August 26, 2008, Ms. Brown sought a neurological evaluation of "rather significant immobilizing headaches" that were occurring two to three times a day and which were so bad they would awaken her from sleep some nights.  R. 259–60.  The headaches "hit suddenly, very sharp, intense, knifelike, and last around 1–2 minutes and rarely up to five minutes."  R. 260.

---

[1] The Court could not find these files in the administrative record, and instead quotes the intake evaluation from Ms. Brown's August 2008 neurological consultation.

Notably, they were located in the same spot where she suffered the scalp laceration.  *Id.*  The

neurologist, Bennett Machanic, M.D., diagnosed Ms. Brown with having suffered a closed head

trauma and possible mild cerebral concussion as a result of her motor vehicle accident.  R. 261.

He described her headaches as "posttraumatic" and as a "classical ice pick headache."  R. 262.

On December 4, 2008 Ms. Brown underwent an MRI.  The MRI resulted in the following

impression:

> Marked burden of white matter disease.  The finding is nonspecific.  Differential
> diagnosis includes microvascular ischemia associated with diabetes, hypertension,
> and migraines.  Lyme disease, sarcoidosis, and other granulomatous diseases
> could have this appearance.  Vasculitis could cause this appearance.
> Demyelination such as multiple sclerosis could cause this appearance although the
> distribution of lesions is not typical.  An MRI with contrast is recommended to
> see if there is associated enhancement.

R. 286.  In January 2009 Christopher J. Centeno, M.D. diagnosed Ms. Brown with mild

traumatic brain injury and prescribed her Lyrica.  R. 279.

In February 2009 Ms. Brown presented to the Brain and Behavior Clinic for a

neuropsychological consultation with Laura M. Rieffel, Ph.D.  R. 280–85.  Ms. Brown reported

headaches, personality changes (increased mood swings), symptoms of depression, and cognitive

difficulties (such as slow speed of information processing, memory difficulties, attention and

concentration problems, distractibility, mental confusion, verbal comprehension difficulties, and

slowed decisionmaking abilities.)  R. 281–82.  Notably, her headaches had become less frequent

since she first saw Dr. Machanic.  R. 282.  During the consultation, Ms. Brown reported that she

was then working 32 hours per week as a Certified Nursing Assistant ("CNA") at Vista Village

Assisted Living, where she had been working for about two years.  R. 283.  She noted that she

had decreased her work hours from full time (40 hours per week) in January 2009 because of her

medical problems.  *Id.*  Dr. Rieffel diagnosed Ms. Brown with post-traumatic stress disorder

4

with depression and post concussive syndrome.  R. 284.  In March 2009, Dr. Rieffel administered neuropsychological testing.  *See* R. 318–57.  The results showed that Ms. Brown had a verbal IQ of 87, a performance IQ of 91, and a full scale IQ of 88.  *See* R. 380.

Ms. Brown also began seeing Edwin Healey, M.D., in March 2009.  Dr. Healey is Board Certified in Occupational Medicine/Neurology.  *See* R. 373.  Ms. Brown was referred to Dr. Healey by her attorney for a second opinion regarding the injuries she sustained in the June 2008 motor vehicle accident.  R. 365.  Dr. Healey met with Ms. Brown and also reviewed her medical records before diagnosing her.  *Id.*  During the consultation, Ms. Brown reported severe headaches ("left parasagittal, frontal sharp, shooting, stabbing and electric-like pains") that occur two to three times per day, and which occasionally wake her up at night.  R. 369.  She also reported problems with concentration and memory, noting that she had twice gotten lost in her neighborhood and had to call her mother for help to return home; that at work she feels her memory and concentration are not good enough for her to pass out medications; and that at work she has on occasion not provided proper care to some of the nursing home patients either because she forgot what she was doing or she became distracted.  R. 369.  Ms. Brown also told Dr. Healey that she had stopped doing the normal household cooking and cleaning activities that she used to perform.  R. 370.  Overall, Ms. Brown stated that her pain along with her cognitive problems and depression interfere with her general activity.  *Id.*  In particular, they interfere with her relationships with others, sleep, and her enjoyment of life.  *Id.*  Finally, Ms. Brown said that she had experienced a significant change in her ability to read and understand what she reads since the accident.  *Id.*

Dr. Healey diagnosed Ms. Brown with several conditions, including (1) left supraorbital nerve post-traumatic neuropathic pain secondary to contusion and scalp laceration, with ongoing

chronic, intermittent daily headaches, not responsive to Lyrica; (2) history of post-concussive

syndrome, with emotional changes including anxiety, irritability, and problems with

concentration, memory, and attention; (3) depression not otherwise specified secondary to mild

traumatic brain injury; and (4) abnormal MRI with microvascular changes.  R. 372.  Dr. Healey

opined that the abnormal MRI was probably not related to the motor vehicle accident.  *Id.*  He

felt that it might be due to a genetic disorder of the cerebral vasculature, termed CADASIL

(Cerebral Autosomal Dominant Arteriopathy with Subcortical Infarcts and

Leukoencephalopathy), but added that other causes of the "marked burden of white matter

disease" might be Lyme disease, sarcoidosis, other granulomatous diseases and vasculitis as well

as demyelinating disease, as mentioned in the December 2008 MRI findings.  *Id.*  Dr. Healey

made a number of recommendations, including that Ms. Brown see a neurologist for further

evaluation.  R. 373.  However, Ms. Brown was unable to afford the copay.

    In June 2009, Ms. Brown began psychotherapy with Jennifer Steinman, MA, LPC,

through the Brain and Behavior Clinic.  R. 401.  At that time, Ms. Steinman assessed Ms. Brown

with a Global Assessment of Functioning ("GAF")[2] score of 60 as well as major depressive

disorder (single episode, moderate) and post-traumatic stress syndrome.  R. 402.  By the end of

2009 Ms. Brown had reported improvement with her emotional symptoms, which she attributed

to her use of Prozac.  R. 420–24.  On December 21, 2009 Ms. Brown concluded that her

depression and cognitive symptoms had improved such that she no longer needed therapy.  R.

424.  Further, on December 30, 2009 Dr. Healey assessed Ms. Brown as having stable

neurocognitive dysfunction and improving depression.  R. 471.

---

[2] GAF stands for Global Assessment of Functioning.  A GAF score of 51–60 indicates "moderate symptoms" (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, 34 (4th Ed. 1994) ("DSM-IV").

In May 2010 Dr. Healey performed the Folstein Mini Mental Status Examination[3] on Ms. Brown. He found that she had marked difficulty with serial seven subtractions but was able to spell the word "world" backwards. R. 382. Ms. Brown was only able to recall one of three words five minutes after she had been asked to remember them. *Id.* She also had mild difficulty placing numbers on a clock and having the hands indicate 3:40. *Id.* Overall, Dr. Healey found that Ms. Brown suffered from moderately severe cognitive dysfunction manifested by problems with concentration, memory, and slowed cognitive processing. *Id.* Dr. Healey noted that Ms. Brown continued "to have marked problems with attention, concentration, memory and cognitive processing." R. 383. He put her on 5mg of Adderall per day to see if it might help her attention and concentration. *Id.* Dr. Healey also diagnosed Ms. Brown under the AMA Guidelines to the Evaluation of Permanent Impairment, finding that she had a combined impairment for her cognitive dysfunction, depression, and left supraorbital neuralgia of 26%. R. 384. In conclusion, Dr. Healey found that Ms. Brown was "approaching maximal therapeutic benefit." *Id.*

Ms. Brown's Adderall prescription was increased to 10mg per day in July 2010, pursuant to a follow up appointment. R. 385. Dr. Healey opined that "Ms. Brown's permanent impairment has not changed from [the] May 26, 2010, follow-up evaluation. Ms. Brown continues to demonstrate moderately severe problems with cognition, memory, thinking and attention, although she has had some improvement in attention and concentration with the Adderall." R. 386. He added, "I continue to have major concerns as to whether or not Ms. Brown will be able to work in the capacity as a CNA in the future, given her permanent cognitive dysfunction." *Id.*

By October 2010 Ms. Brown was reporting that her symptoms remained largely unchanged—she continued to have problems with memory, concentration, and attention—but

---

[3] A copy of the exam can be found here: http://www.utmb.edu/psychology/Folstein%20Mini.pdf.

that her more recent use of Adderall had "definitely improved these symptoms." R. 374. By this time, Ms. Brown had to cut back to three days (24 hours) per week at her job "because of increased mental fatigue." *Id.* Ms. Brown reported that her major concern was the difficulty she faced in performing her job, noting that she had already been demoted. *Id.* Dr. Healey concluded, "I am also very concerned as to whether M[s]. Brown, if she were to lose her current job because of poor cognitive performance, would be able to return to any type of work and, thus, be permanently and totally disabled, which, in my opinion, will probably occur in the near future. She will require her current medications i.e. Adderall and Prozac indefinitely." R. 376.

In November 2010 Ms. Brown underwent a follow-up interview by the Brain and Behavior Clinic. R. 388. Stephen Schmitz, Ph.D., found that Ms. Brown's "emotional functioning had improved with her medication and the psychotherapy she had completed." *Id.* Nevertheless, Dr. Schmitz concluded that Ms. Brown was "continuing to experience the functional neurocognitive effects of a traumatic brain injury experienced in the June 14, 2008 automobile accident." R. 389. He further opined that it was "likely that Ms. Brown has reached MMI [(Maximum Medical Improvement)] with respect to her neurocognitive functioning. She should continue to take her medications and utilize as many compensatory and limit setting strategies as she can in order to maintain her current job. Should she lose that position she would likely be at a significant disadvantage in being able to compete with others in jobs for which she is otherwise qualified." *Id.*

On January 31, 2011, Dr. Healey wrote a letter expressing his continued opinion "that Ms. Brown has substantial cognitive deficits related to her motor vehicle accident which severely impact on her ability to work or live independently." R. 427.

On March 1, 2011 the State agency mental health medical consultant Mark Berkowitz, Psy.D., evaluated Ms. Brown's claim and determined that her condition did not meet or medically equal any of the mental health Listings, specifically Listings 12.02 and 12.04. R. 90–93.  Each Listing has three alphabetical criteria.  Dr. Berkowitz found that Ms. Brown met the "paragraph A" criteria for both Listings but did not meet the criteria of paragraphs B or C.  R. 90.  In particular, Dr. Berkowitz found that "paragraph B" was not satisfied because Ms. Brown did not show marked restrictions in two of the following three categories, or in one category coupled with repeated episodes of decompensation: (1) restriction of activities of daily living (moderate); (2) difficulties in maintaining social functioning (mild); and (3) difficulties in maintaining concentration, persistence, or pace (moderate).  *Id.*  Dr. Berkowitz explained that Ms. Brown was moderately limited in her ability to understand, remember, and carry out detailed instructions, maintain attention for extended periods of time, and sustain an ordinary routine without special supervision.  R. 93.  He added that she was capable of engaging in work needing little or no judgment, involving simple duties which can be learned on the job in a short period of time (up to one month).  *Id.*

On August 17, 2011 Ms. Brown reported to the emergency room complaining that a week earlier she had experienced pain that "felt like a brick was across the top of her head pushing down."  R. 448.  She described the pain as "the worst she has had" and explained that her doctor had requested that she go to the emergency room for imaging.  *Id.*  The hospital performed an MRI to make sure there was no sign of an aneurysm.  R. 450–51.  The impression from the MRI was the following: Extensive supratentorial and to a lesser extent infratentorial white matter T2 hyperintensity, a nonspecific appearance; otherwise normal intracranial MRI, with no aneurysms or vascular stenosis demonstrated.  R. 459.  Basically, the MRI showed white matter disease but

no aneurysm.  R. 451.  The ER doctor discussed the situation with Dr. Healey, who asked that

Ms. Brown stop taking her Adderall.  R. 451.

On April 25, 2012 Dr. Healey filled out a report entitled Medical Opinion Re: Ability to

Do Work-Related Activities (Mental).  R. 476.  He marked Ms. Brown as "severely limited"—

having noticeable difficulty from 11 to 20 percent of the workday or work week—in the

following areas: (1) ability to deal with normal work stress; (2) ability to understand and

remember detailed instructions; (3) ability to carry out detailed instructions; and (4) ability to

deal with stress of semi-skilled and skilled work.  R. 476–77.  He noted that Ms. Brown suffered

from degenerative vascular brain disease that had been permanently aggravated by the traumatic

brain injury she suffered in her auto accident.  R. 477.  Finally, he opined that Ms. Brown's

impairments would cause her to be absent from work approximately four days per month.  *Id.*

On March 12, 2012 Ms. Brown met with Kelle Holgorsen, PA, to establish care.  R. 473.

She reported that she could no longer see Dr. Healey because her insurance had run out.  *Id.*  No

diagnoses were made at this time.  *See id.* at 473–74.  A month later Ms. Brown returned for a

physical exam.  R. 482.  No diagnoses relevant to this appeal were made at this appointment.

*See* R. 482–84.

### Other Evidence

The administrative record includes letters from Ms. Brown's employer, a friend, a former

co-worker, and her mother each discussing the ways in which her functional and emotional

capacity changed after her accident.

On April 9, 2009 Ms. Brown's employer Robin Dunbar, LPN, wrote a letter reporting

that since the accident Ms. Brown no longer passed out medication to residents, her

concentration skills had diminished, and she had to cut back her hours from 40 to 32 hours per

week because a full time schedule "appeared to stress her out."  R. 216.  In a second letter dated

May 27, 2010, Ms. Dunbar reported that she has "seen many deficits in [Ms. Brown's] ability to

complete her work.  It does appear to be a memory problem."  R. 217.  She continued, "[Ms.

Brown] forgets a lot of her duties.  [For e]xample she gives clean laundry to the wrong residents,

[and] forgets to do every day duties for the residents . . . ."  *Id.*  Ms. Dunbar added that other

employees have to help Ms. Brown by "remind[ing] her to do things just to keep her on task."

*Id.*  Finally, Ms. Dunbar reported that Ms. Brown's "health has also suffered; she catches colds

often, and is tired and worn out by the end of the day.  [She] does appear to be run down."  *Id.*  In

a third and final letter dated September 23, 2010, Ms. Dunbar wrote that she has seen Ms. Brown

"struggle to keep up.  She is tired, and has relied on her co-workers to help her out.  She is

forgetful with her assignments, and I no longer have her passing out medications to our residents.

This has been for a while."  R. 218.  She added that Ms. Brown only works part time, but that

"still she has more days where she is not at the top of her potential.  [Ms. Brown] feel[s] she may

need to cut back even more days of her work."  *Id.*  Notably, Ms. Brown's performance

evaluation from September 2010 gave an overall indication of "Improvement Needed," meaning

that "[p]erformance is deficient in certain areas, improvement is necessary."  R. 230.

"Improvement Needed" is the second to lowest ranking one can score on the performance

evaluation.

On April 9, 2009 Ms. Brown's friend Kelli Matz wrote a letter describing how her

friendship with Ms. Brown had changed since the accident.  R. 232.  She wrote that before the

accident, "we used to talk on the phone alot [*sic*] and have lot's [*sic*] of great conversations.

Now we talk less, [Ms. Brown] gets very moody, and can't always remember what it is we have

talked about." *Id.* She added that since the accident "[Ms. Brown] sometimes gets a little teary eyed, and very depressed. [She] also seems to be having trouble concentrating at times." *Id.*

On April 10, 2009 Ms. Brown's coworker Edwin Lin wrote a letter. explaining that prior to the accident Ms. Brown "was fine," but that after the accident she is "no longer able to complete the same daily tasks at the workplace that she was once able to do . . . ." R. 233. He added that she "talks about how tired she constantly feels . . . ." *Id.*

Finally, Ms. Brown's mother, Millie Cruz, wrote an undated letter on Ms. Brown's behalf. R. 256–57. In it she indicated that before the accident Ms. Brown "was very alert, and sharp minded." R. 256. For example, Ms. Brown had been a manager at an assisted living facility, and in that role "she hired new employees, kept track of payroll, made activity calendars, etc." *Id.* Since the accident, Ms. Brown "got her med[ical] certification revoked" and she "went from working 40 hours a week down to 24 hours a week." *Id.* Ms. Cruz reported that she "travel[s] with [Ms. Brown] to do common errands, and when she needs to go somewhere new to ensure she doesn't get lost. Sometimes during driving, [Ms. Brown] forgets where she is going." *Id.*

On February 3, 2011 William M. Hartwick, MS, CRC, CLCP (Vocational Consultant) performed a vocational evaluation of Ms. Brown, presumably at the direction of Ms. Brown's attorney. R. 429–37. Mr. Hartwick reviewed Ms. Brown's medical history since the accident and also interviewed Ms. Brown with her mother present. R. 429–35. During the interview Ms. Brown reported significant fatigue on a daily basis as well as continued difficulty with her memory, including an inability to complete routine activities of daily life and the responsibilities of her job. R. 433. She discussed how she had been relieved of her duties as a medication

technician due to her memory problems.  *Id.*  Ms. Brown's mother added that Ms. Brown relies

on her for help with grocery shopping, household chores, and cooking.  *Id.*

After reviewing the information discussed above as well as Ms. Brown's personal

background, educational background, and employment history, Mr. Hartwick opined "that Ms.

Brown is unable to perform the duties of her usual and customary employment as a personal care

provider.  Furthermore, the client's continued cognitive deficits will impede her ability to

perform any other unskilled occupation in the local or national economy.  Her ability to be

retrained is also negatively impacted by her continued cognitive deficits and depression."  R.

436.

### Reported Limitations

After applying for disability benefits, Ms. Brown filled out a Function Report, R. 207–14,

and testified about her functional limitations in an administrative hearing, R. 45–82.  In the

report, Ms. Brown wrote that her ability to work was limited "because of loss of concentration

with brain injuries noise is a factor in my case lack of direction and understanding."  R. 207.  She

also said that she gets "very tired when my medication wares [*sic*] off, have to go lay down for

naps."  *Id.*  She prepares her own meals every day, but noted that she doesn't always cook dinner

or full meals because she gets too tired.  R. 209.  As for household chores, Ms. Brown wrote that

every other day she cleans for about four hours, does laundry for an hour, and vacuums for half

an hour.  *Id.*

Regarding her limitations, Ms. Brown wrote that she needs reminders to take her

medication, and that she has to be accompanied by her mother when she drives because she can

get disoriented and lose her way.  R. 209–10.  Ms. Brown has reported that her only hobby is

watching television, which she does daily.  R. 211.  Socially, she keeps in touch with friends by

talking on the phone.  *Id.*  Overall, she reported that her conditions affect her memory, concentration, and understanding.  R. 212.  For example, she can only follow spoken instructions if they are "broken down" such that she can understand them.  *Id.*

Ms. Brown also filled out a Fatigue Questionnaire.  R. 215.  In it she reported that she gets fatigued three to four times a day because of her medication and that she has to take naps to reenergize.  *Id.*  She said that she can resume activities 20 to 30 minutes after taking a nap.  *Id.*  Since suffering from fatigue, she has had to cut out "dancing, walking the flea market, [and] baseball games."  Id.  That said, she reported that she could take care of herself as far as her personal needs were concerned.  Id.

Ms. Brown also testified to her functional limitations during the ALJ hearing.  She described having problems with "concentrating and understanding what people have asked of me to do."  R. 57.  She discussed her fatigue, saying that she doesn't know why she "get[s] so tired" but that she takes a couple of naps per day and is "just not active like [she] used to be."  R. 58. She also testified that at the end of her time at Vista Village she "had coworkers working beside [her] and helping [her] so that [she] could get the help without doing the wrong things that [she] was doing."  R. 63.  She added that she was forgetful at work, describing how when she washed the residents' laundry she might "forget where [she] put it, where [she'd] take it to. [She'd] give it to the wrong resident."  *Id.*  She would also serve food to the wrong people and had accidentally left a patient unattended at least once.  R. 64.  She found she got distracted easily and that "a lot of [her] work would be undone."  *Id.*  By the end of her employment, she was avoiding her work, even resorting to hiding in closets.  *Id.*  She said she "was always counting on [her] coworkers to help [her] out, because [she] didn't want to get fired."  R. 65.

Ms. Brown testified to some of the same limitations as those indicated in her Function

Report.  For example, she stated that she would get lost driving and that she would have to stop

and call her mother for help.  R. 65.  Further, she reported that she needs her mother to remind

her to take her medications and that she "really [doesn't] go anywhere unless [her] mom's with

[her]."  R. 65–66; *see also* R. 68.  She also elaborated on how she completes household chores.

For example, she testified that she "would start something, and [she] would forget that [she was]

doing it."  R. 66.  She would try cooking something and end up burning pans; in fact, she

reported that while she cooks for herself, she cannot cook on the stove.  *Id.*  She said that if she

gets distracted by something, she will "walk away and just leave the food there."  *Id.*

### Denial of the Claim

The Social Security Administration uses a five part process to determine whether a

claimant qualifies for disability insurance benefits.  20 CFR § 404.1520.  At **step one**, the ALJ

must determine whether the claimant is engaging in substantial gainful activity.  20 CFR §

404.1520(a)(4)(i).  The ALJ found that Ms. Brown had not engaged in substantial gainful

activity since her alleged onset date of December 21, 2010.  R. 26.

At **step two**, the ALJ must determine whether the claimant has a medically determinable

impairment that is "severe" or a combination of impairments that are "severe."  20 CFR §

404.1520(a)(4)(ii).  The ALJ found that Ms. Brown suffered from the following severe

impairments: traumatic brain injury with cognitive and emotional limitations, anxiety disorder,

depressive disorder, disorder of the knees, and obesity.  R. 26.

At **step three**, the ALJ must determine whether the claimant's impairment or

combination of impairments meets or medically equals the criteria of an impairment listed in 20

CFR Part 404, Subpart P, Appendix 1 (the "Listings").  20 CFR § 404.1520(a)(4)(iii).  The ALJ

determined that none of Ms. Brown's impairments—alone or in combination—met or medically equaled one of the listed impairments in the Listings.  R. 27.

Before reaching step four, the ALJ is required to determine the claimant's residual functional capacity ("RFC").  *See* R. 17; 20 CFR § 404.1520(a)(4)(iv).  An RFC represents "the most [a claimant] can still do despite [her] limitations."  20 C.F.R. § 404.1545(a)(1).  The RFC is "the claimant's maximum sustained work capability."  *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988).  The ALJ found that Ms. Brown has an RFC to perform a full range of light work as defined in 20 CFR §§ 404.1567(b) and 416.967(b), with the following specific restrictions and requirements: (1) not required to balance, stoop, crouch, or climb stairs and ramps more than frequently; (2) not required to climb scaffolds, ladders, and ropes, crawl, or kneel; (3) not required to work at unguarded heights or near unguarded hazardous mechanical equipment; (4) not required to do more than unskilled work; and (5) not required to adapt to more than simple changes in a routine work setting more often than on a weekly basis.  R. 29.

At **step four**, the ALJ must determine whether the claimant has the residual functional capacity to perform the requirements of her past work.  20 CFR § 404.1520(a)(4)(iv).  The ALJ found that Ms. Brown could no longer perform past relevant work.  R. 37.

At **step five** the ALJ must determine whether the claimant is able to do any other work that exists in significant numbers in the national economy considering the claimant's RFC, age, education, and work experience.  20 CFR § 404.1520(a)(4)(v).  Taking into account the limitations noted above, the ALJ found that Ms. Brown would be able to perform the requirements of representative occupations such as assembler of plastic hospital products, which is unskilled and involves light exertion, and which exists in significant numbers in the national economy.  R. 38.

## ANALYSIS

Ms. Brown raises four issues on appeal.  She claims that the ALJ: (1) should have found that she was disabled because she met the criteria of Listing 12.02; (2) failed to base his mental RFC assessment on substantial evidence in the record; and (3) failed to base his credibility assessment on substantial evidence in the record.  She also argues that the Commissioner erroneously failed to include new evidence reviewed by the Appeals Council when submitting the administrative record to this Court.

Overall, the Court finds that the ALJ gave Ms. Brown's case a thorough review accompanied by a detailed explanation of his decision.  However, the Court agrees with Ms. Brown that the ALJ erred by failing properly to evaluate Dr. Healey's treatment records and to fully consider the letters submitted by Ms. Brown's employer, friends, and mother.  The case is remanded for review on these limited matters.  Further, the Appeals Council properly concluded that the new evidence should not have been included in the administrative record, and it should therefore not be considered on remand.

### A. Listing 12.02

Ms. Brown argues that she should have been found disabled because her mental impairments meet or medically equal Listing 12.02, 20 C.F.R. § 404, Subpart P, Appendix 1.  In the alternative, she contends that the ALJ erred in failing to obtain medical expert testimony from an expert in psychology or psychiatry and in failing to take into account new evidence that was not in front of the State agency psychological consultant at the time he made his assessment.

During the hearing, the ALJ called a rheumatologist, Hayden Alexander, MD, to testify as to his opinion of Ms. Brown's medical conditions, which he based on a review of the medical records in the case. R. 47–57.  The testimony was elicited so the ALJ could obtain a medical

expert opinion as to whether Ms. Brown met or equaled any of the physical impairment Listings. *See* R. 48.  Dr. Alexander opined that she did not.  *Id.*  Dr. Alexander also noted that he was unqualified to give an opinion as to whether Ms. Brown met any mental impairment Listing, such as Listing 12.02.  R. 49–50, 55–56.  At the end of the hearing, Ms. Brown's attorney asked that the ALJ consult a psychiatrist medical expert for his or her opinion regarding the mental Listings.  R. 81.  The ALJ failed to do so without explanation.  *See* R. 24–38.

In his decision, the ALJ found that Ms. Brown did not meet Listing 12.02's requirements. He based his decision on a review of the entire record, including the State agency psychiatric examiner's opinion along with the other medical records on file.  R. 27.  As noted above, Dr. Berkowitz, the State agency examiner, had concluded that Ms. Brown did not meet the criteria for Listing 12.02 or its medical equivalent.  R. 90–93.

First, the ALJ found that Ms. Brown did not satisfy the "paragraph B" criteria for the Listing, which requires that her mental impairments result in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration.  20 C.F.R. § 404, Subpart P, Appendix 1, § 12.02(b).  A marked limitation means more than moderate but less than extreme.

The ALJ discussed the severity of Ms. Brown's cognitive and emotional symptoms following her 2008 motor vehicle accident.  In all, he found that Ms. Brown suffered from severe limitations in the domains of activities of daily living and concentration, persistence, or pace, but that these limitations were moderate, not marked.  R. 28.  He based this decision in part on the fact that Ms. Brown was able to continue working for approximately a year and a half after her accident, though she did so with assistance.  *Id.*  He also found that her cognitive limitations had

stabilized by 2010, suggesting that Ms. Brown retained the cognitive and emotional abilities she had while working.  *Id.*  Finally, he considered that Ms. Brown was able to perform basic household chores and make simple meals, and that she was able to watch television, though she reported some difficulty in following plot lines.  *Id.*  Overall, he concluded that these retained abilities rendered her limitations moderate, not marked.  *Id.*  The ALJ also found mild limitations in social functioning and no episodes of decompensation.  *Id.*

Ms. Brown argues that she suffered marked, not moderate, limitations in her activities of daily living and in her concentration, persistence, and pace.  However, her argument simply rehashes the evidence that the ALJ already took into account.  [*See* ECF No. 13 at 15].  The Court finds that the ALJ's opinion regarding the "paragraph B" criteria was based on substantial evidence in the record.  The Court cannot substitute its judgment for that of the ALJ, whose findings must stand.

The ALJ also found that Ms. Brown did not meet the Listing's "paragraph C" requirements.  R. 29.  The issue in this case is whether Ms. Brown has shown that she has a "[c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement."  20 C.F.R. § 404, Subpart P, Appendix 1, § 12.02(c).  The ALJ found that "there is no documented evidence that suggests that [Ms. Brown] is unable to function outside of a highly[] supportive living arrangement."  R. 29.  In particular, he found that since the accident Ms. Brown has "maintained adequate activities of daily living and the evidence shows that she has not experienced a significant deterioration in symptoms since her alleged onset date."  *Id.*  In turn, the ALJ found that Ms. Brown was "capable of living independently" and therefore did not satisfy the "paragraph C" criteria.  *Id.*

The question we turn to is what exactly constitutes a "highly supportive living arrangement." The regulations suggest that such an arrangement typically constitutes placement in a hospital, halfway house, care facility, or personal home setting that "greatly reduce the mental demands placed on [the claimant]." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(F); *see also Myers v. Colvin*, 721 F.3d 521, 526 (8th Cir. 2013); *cf. Washington v. Shalala*, 37 F.3d 1437, 1442 (10th Cir. 1994). Ms. Brown argues that living with her mother constitutes a highly structured living arrangement. However, the living arrangement is never described in a way that suggests it is highly structured such that it greatly reduces the mental demands placed on Ms. Brown. While it is true that Ms. Cruz reminds Ms. Brown to take her medication and accompanies her on drives, Ms. Brown still seems to be functionally independent. For example, she makes her own meals (though she does not use the stove), cleans the house, does laundry, and vacuums. Notably, the burden is on the claimant to prove that she is living in a highly structured living arrangement. In reviewing the record, the Court finds that there was substantial evidence supporting the ALJ's conclusion that Ms. Brown was not living in one.[4]

In the alternative, Ms. Brown argues that the ALJ should have considered or given controlling weight to Dr. Healey's opinion that Ms. Brown was unable to work or live independently. First, this articulation somewhat overstates Dr. Healey's opinion, which was that Ms. Brown's cognitive defects "severely impact on her ability to work or live independently." R. 427. Second, opining that her ability to live "independently" was severely impacted does not necessarily mean that Ms. Brown was unable to function outside of a highly supportive living arrangement that greatly reduced the mental demands placed on her.

---

[4] Though the ALJ did not include this fact in his opinion, the Court notes that on January 27, 2011 Ms. Brown reported that she could take care of herself as far as her personal needs were concerned. R. 215. This statement further supports the ALJ's determination.

Ms. Brown also contends that the ALJ should not have relied on Dr. Berkowitz's opinion because new evidence was submitted after the March 2011 evaluation that could have affected his opinion.  Ms. Brown cites Social Security Ruling ("SSR") 96-6p in support of her argument. In particular, SSR 96-6p states that an ALJ must obtain an updated medical opinion from a medical expert in the following circumstances:

> When additional medical evidence is received that *in the opinion of* the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.

1996 WL 374180, at *3–4 (July 2, 1996) (emphasis added).[5]  According to Ms. Brown, significant mental health evidence was submitted at the hearing level that was not in the file Dr. Berkowitz reviewed.  [ECF No. 13 at 12–13].  This evidence includes records and reports from Dr. Healey dated April 2009–August 2011; a medical source statement signed by Dr. Healey regarding Ms. Brown's ability to do work-related activities dated April 25, 2012; and emergency room records from August 2011 that include impressions from a second MRI confirming the presence of extensive white matter disease.  *See id.*

According to the ALJ, he took into account this new evidence.  *See* R. 27.  He specifically found that "no treating or examining physician suggested that the claimant's impairments meet or equal a [L]isting."  *Id.*  Further, under SSR 96-6p, an ALJ has broad discretion to decide whether to call a medical expert.  1996 WL 374180, at *3–4 (July 2, 1996); *see also Simien v. Astrue*, 06-5153, 2007 WL 1847205, at *3 (10th Cir. June 28, 2007).  The Court understands that Ms. Brown's attorney asked the ALJ to seek a second medical opinion

---

[5] Social Security Rulings "are binding on all components of the Social Security Administration."  20 C.F.R. § 402.35(b)(1).  The rulings represent "precedent final opinions and orders and statements of policy and interpretations that [the Commissioner has] adopted."  *Id.*  They are to be relied upon as precedents in adjudicating cases.  *See* Social Security Rulings: Preface, *available at* http://ssa.gov/OP_Home/rulings/rulings-pref.html.

regarding the mental impairment Listings, but the ALJ was not required to comply with that request. Because the Court finds that there was substantial evidence to support the ALJ's finding, the issue is not remanded for further findings or conclusions.

### B. RFC Assessment

Ms. Brown's second argument is that the ALJ failed to base his mental RFC findings on substantial evidence, and that he erred in his treatment of the treating source opinions and other opinions on which he based his RFC findings.

"[I]n evaluating the medical opinions of a claimant's treating physician, the ALJ must complete a sequential two-step inquiry, each step of which is analytically distinct." *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). "The initial determination the ALJ must make with respect to a treating physician's medical opinion is whether it is conclusive, i.e., is to be accorded 'controlling weight,' on the matter to which it relates." *Id.* (citing *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003)). The opinion must be given controlling weight if "it is well-supported by medically acceptable clinical or laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." *Id.* (citing *Watkins*, 350 F.3d at 1300; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)). If the opinion is deficient in either of these respects, it should not receive controlling weight. *Id.*

If a medical opinion by a treating physician is not given controlling weight, it is still entitled to deference and must be weighed using the factors provided in 20 C.F.R. §§ 404.1527 and 416.927. *Watkins*, 350 F.3d at 1300 (citing SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996)). Those factors are:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion

is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.* at 1301 (citing *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001)).  Although an ALJ should consider all of these factors, it is not necessary that he explicitly discuss every factor. *Oldham*, 509 F.3d at 1258.  Moreover, the ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability.  *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004).

After considering these factors, the ALJ "must make clear how much weight the opinion is being given (including whether it is being rejected outright) and give good reasons . . . for the weight assigned." *Krauser*, 638 F.3d at 1330.  "[T]he ALJ's findings must be 'sufficiently specific to make clear to any subsequent reviewers the weight he gave to the treating source's medical opinion and the reason for that weight.'" *Id.* at 1331 (citation and alterations omitted).

According to the plaintiff, the ALJ failed to engage in this two-step analysis with regard to treating source opinions.  Ms. Brown argues that the ALJ rejected portions of treating source opinions that did not comport with his RFC findings without basing his decision to reject these opinions in substantial evidence.  [ECF No. 12 at 18].  Further, she contends that in some cases the ALJ completely failed to address opinions favorable to a finding of disability.  *Id.*

*Dr. Healey*

In October 2010 Dr. Healey, Ms. Brown's treating physician, wrote: "I am also very concerned as to whether Ms. Brown, if she were to lose her current job because of poor cognitive performance, would be able to return to any type of work and, thus, be permanently and totally disabled, which, in my opinion, will probably occur in the near future." R. 376.  According to Ms. Brown, the ALJ should have but did not address this opinion in his decision.  The Court could not find any reference to this statement in the opinion and agrees that it is significant

enough that it should have been considered by the ALJ under the standard reserved for treating physicians.

Notably, the ALJ did consider at least two other records from Dr. Healey, one from January 2011 and one from April 2012.  R. 34.  The January 2011 report included an opinion that Ms. Brown's cognitive deficits severely impact her ability to work and live independently.  *See id.*  The ALJ found that "[w]hile Dr. Healey's statement suggests severe symptoms and limitations, his opinion does not indicate that the claimant is precluded from working or living independently, he merely notes that the claimant's mental limitations will severely impact her ability to function independently."  *Id.*  While technically this distinction is accurate, the ALJ does not opine as to what the practical differences would be.  The ALJ continued, "While the undersigned finds that this statement may overstate the claimant's limitations, he finds that Dr. Healey's opinion is not inconsistent with the findings in this decision."  *Id.*  Yet, the ALJ's decision necessarily presumes the conclusion that Ms. Brown can work independently.  In fact, he found that given her ability to perform semi-skilled work with the help of coworkers, she would be able to perform unskilled work, presumably on her own.  *See* R. 33–34.  The Court finds that Dr. Healey's opinion was significant and should have been analyzed under the two-step inquiry outlined above.

The April 2012 record was effectively a medical source statement concerning Ms. Brown's mental residual functional capacity.  Notably, this form was completed over a year after Ms. Brown stopped receiving treatment from Dr. Healey.  That said, the ALJ thoroughly discussed the opinions contained therein and afforded "significant weigh[t]" to most of the assessment.  R. 34.  The only section of the statement to which the ALJ afforded "minimal weight" was the part in which Dr. Healey opined that Ms. Brown would miss four or more days

of work per month due to her impairments.  The ALJ found that "this restriction is not consistent with the claimant's past work history or the record as a whole."  *Id.*  The Court disagrees.  Ms. Brown cut back her hours at Vista Village from 40 hours (five days) to 32 hours (four days) per week soon after her accident.  From there, she reduced her schedule to 24 hours (three days) per week.  If anything, the record and her work history suggest that Ms. Brown would have to take off one to two days per week, or four to eight days per month.  While it is possible she could work five days per week at an unskilled job, as compared to her inability to do so at a semi-skilled job, it is not clear from the record that this would be the case.[6]  The Court finds that the weight afforded to this portion of Dr. Healey's opinion is not supported by substantial evidence in the record.

The defendant argues that the three records discussed above constitute opinions on the ultimate legal issue of disability, a determination reserved to the Commissioner.[7]  [*See* ECF No. 14 at 17].  The Court takes such argument to imply that these opinions should therefore not be taken into consideration.  To be clear, a medical source opinion on any issue must be given careful consideration, "including opinions about issues that are reserved to the Commissioner."  SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996).  Just because those opinions are not entitled to controlling weight or special significance, *see id.*, does not mean they can be disregarded.

---

[6] Notably, one need not work full time (five days, 40 hours per week) to meet the substantial gainful activity ("SGA") threshold.  Instead, SGA is calculated based on income.  A non-blind individual earning $1070 per month meets the SGA threshold and will be considered not disabled.  *See* Social Security: Substantial Gainful Activity, *available at* http://www.socialsecurity.gov/oact/cola/sga.html.

[7] The defendant also comments on the fact that the April 2012 record is a "checkmark-style form" without elaborating on the implications, if any, of that format.  [*See* ECF No. 14 at 17].  In case a suggestion against the significance of this record was implied, the Court notes that "the fact that a treating physician's opinion is conveyed through responses to a simple questionnaire does not, standing alone, justify disregarding that opinion where it is based on the physician's history of examining and treating the patient."  *Troy ex rel. Daniels v. Apfel*, 225 F. Supp. 2d 1234, 1242 (D. Colo. 2002).

Overall, the Court finds that the case must be remanded for further findings on Dr. Healey's treatment records and opinions.  These treatment records should be analyzed under the two-step inquiry discussed above.  Further, any opinions given on the ultimate issue of disability must carefully be considered.

*Dr. Schmitz*

In November 2010, Ms. Brown reported for a neuropsychological evaluation with Dr. Schmitz.  In his report, Dr. Schmitz wrote that should Ms. Brown lose her job, "she would likely be at a significant disadvantage in being able to compete with others in jobs for which she is otherwise qualified."  R. 389.  The ALJ interpreted this statement to mean that Ms. Brown was "capable of working, but she will have a difficult time getting work as and performing the requirements associated with the work of a CNA due to her cognitive defects."  R. 32.  Ms. Brown contends that this interpretation is inconsistent "with the plain language of the opinion, i.e., that [Ms. Brown] would be at a disadvantage in competing with others *in jobs*.  It does not say difficulty competing with others *to obtain jobs*."  [ECF No. 13 at 20] (emphasis in original).  Suffice it to say, the Court agrees with the ALJ that Dr. Schmitz's statement suggests that Ms. Brown could continue to work, but that she would have a difficult time competing with others for employment opportunities.  Further, the ALJ is correct in noting that the ability (or inability) to obtain employment does not alter the disability analysis concerning whether an individual's physical and mental impairments preclude her from performing any work in the national economy.  *See* R. 32; 42 U.S.C. § 423(d)(2)(A).

*Dr. Berkowitz*

Ms. Brown contends that the ALJ should not have given "significant weight" to Dr. Berkowitz's opinion because he did not have the complete record to review—in particular, he

did not have Dr. Healey's treatment records—when he conducted his evaluation. According to Ms. Brown, SSR 96-6p effectively precludes the ALJ from relying on the opinion of Dr. Berkowitz for this reason. However, the rulings actually state that "the opinions of State agency medical and psychological consultants . . . can be given weight only insofar as they are supported by evidence in the case record . . . including any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency [consultant] . . . ." SSR 96-6p, 1996 WL 374180, at *2 (July 2, 1996). In this case, the ALJ found that "Dr. Berkowitz's opinion is generally consistent with the limitations described by Dr. Healey . . . ." R. 35. Ms. Brown does not argue that Dr. Berkowitz's opinion is unsupported by evidence in the case record, but simply that it was made without Dr. Healey's records. Her argument is unavailing.

In the alternative, Ms. Brown contends that Dr. Berkowitz's opinion was not properly incorporated into the RFC. Dr. Berkowitz found that Ms. Brown suffered from significant limitations in the ability to maintain attention for extended periods of time and to sustain routine without supervision. R. 93. After making these initial observations, Dr. Berkowitz made specific findings regarding Ms. Brown's capabilities, finding that Ms. Brown was "capable of engaging in work needing little or no judgment, involving simple duties which can be learned on the job in a short period of time (up to one month)." *Id.* The RFC Assessment included a limitation to perform nothing beyond unskilled work and not to be forced to adapt to more than simple changes in a routine work setting more often than once a week. Ms. Brown's previous position as a CNA was semi-skilled work. Notably, semi-skilled work may require alertness and close attention whereas unskilled work needs little or no judgment and consists of doing simple duties that can be learned in a short period of time. 20 C.F.R. § 404.156. Overall, the RFC

appears to incorporate Dr. Berkowitz's observed limitations.  It is unclear to this Court what more should have been included in the RFC, and Ms. Brown offers no suggestions of her own.

### C. Credibility Determination

Next, Ms. Brown argues that the ALJ failed to base his credibility determination on substantial evidence.  "Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence." *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005).  However, these determinations "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Id.*

A claimant's statements alone are not enough to establish disability.  42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1528(a).  But the Commissioner cannot ignore those statements, as they often provide some of the best evidence of pain and other physical limitations.  Therefore the ALJ must evaluate the credibility of the claimant's testimony where that testimony could influence the ultimate finding of disability.  20 C.F.R. § 404.1529(a).  In this case, the ALJ concluded that Ms. Brown's testimony regarding the limiting effects of her impairments was not credible to the extent it conflicted with the RFC Assessment.  R. 31.  This Court has recently discussed the foregoing boilerplate language and has noted that it can be problematic "'when it appears in the absence of a more thorough analysis.'"  *Lloyd v. Colvin*, No. 12-CV-3350-RBJ, 2014 WL 503765, at *9 (D. Colo. Feb. 6, 2014) (quoting *Holbrook v. Colvin*, 521 F. App'x 658, 664 (10th Cir. 2013)).  In this case, however, the Court finds that the analysis was thorough, and the ALJ's conclusions were supported by substantial evidence in the record.

Ms. Brown argues that three factors were inappropriately considered when the ALJ made his credibility determination.  She begins by contending that her high school academic record

should not have been taken into account to determine her credibility.  Notably, all the ALJ wrote

on this matter was that Ms. Brown had earned mostly failing grades in high school, and that this

fact was inconsistent with her reports that she did not experience cognitive problems in school.

R. 32.  The ALJ did not discuss this discrepancy in regards to his credibility determination.

Instead, this observation was made in the midst of a discussion of Ms. Brown's November 2010

neuropsychological consultation, and was followed by a thorough discussion of those records.

*See id.*  The Court can find no evidence to suggest that this statement played a role in the ALJ's

credibility determination.  Yet even if it did, the ALJ would have been permitted to take

conflicting evidence into account when making his credibility findings.

Next, Ms. Brown contends that the ALJ improperly mischaracterized her motivation for

seeking a primary care physician in March 2012.  In particular, the ALJ wrote that Ms. Brown

sought treatment "because her disability attorney told her that she needed to obtain a primary

care physician.  This suggests that the claimant'[s] primary reason for seeking treatment was not

related to her physical and mental impairments."  R. 33.  The Court agrees that this statement,

standing alone, could suggest an improper characterization of a claimant's motivation for

seeking treatment.  The Court recognizes that many applicants cannot afford to have a primary

care physician when they are no longer working because they lose their insurance.  And yet the

application process is such that an individual needs medical records in order to succeed on her

claim.  Therefore, the Court would not find it appropriate to presume deceitful or scheming

behavior when an individual seeks a primary care physician in order to document her medical

conditions.  However, the Court finds that the ALJ took this factor into consideration.  Notably,

the next sentence he wrote was, "The claimant's lack of treatment could be somewhat related to

her lack of insurance.  She did note that she was no longer able to see her previous doctor

because she did not have insurance." *Id.* Finally, the ALJ noted that Ms. Brown "did not demonstrate significant mental or physical symptoms or limitations during the March 2012 examination, which suggests that her lack of treatment may have also been due to improved symptoms." *Id.* Overall, the ALJ took these three possibilities into account, discussed the March 2012 examination in detail, and found that the "reports suggest that the claimant experienced fewer emotional symptoms of limitations than she described elsewhere in the record." *Id.* The Court finds that there is substantial evidence supporting this conclusion and that it is not based on an unfair perception as to the reason Ms. Brown sought treatment.

Finally, Ms. Brown argues that the ALJ improperly took into account that she was cooperative, well-groomed, had good eye contact and normal affect, and no problems with recall during a mammogram (or well woman) exam. [*See* ECF No. 13 at 25]. The Court finds that these are all perfectly valid factors for the ALJ to consider, with one exception. The ALJ noted that "[t]here is no *mention* of difficulty with recall," whereas a month prior the same treatment provider had indicated that Ms. Brown had difficulty with recall and with her ability to form sentences. R. 33 (emphasis added). Ms. Brown contends that there was no need for there to have been any "recall" at this second examination since a full medical history had been provided just a month earlier. [ECF No. 13 at 25]. According to Ms. Brown, "It is therefore not surprising that problems with recall were not noted, because recall was not required." *Id.* The Court agrees, and it sees how this statement would appear prejudicial. However, in reviewing the entirety of the ALJ's opinion, it is clear that this one examination was not determinative of the outcome of the case. Instead, the ALJ's decision primarily focuses on the objective medical evidence on record as well as Ms. Brown's ability to perform semi-skilled work with the help of her coworkers long after her car accident.

Overall, Ms. Brown argues that "the ALJ was engaging in an impermissible culling of the record for isolated bits of evidence designed to a preconceived conclusion, which does not satisfy the substantial evidence test." [ECF No. 13 at 25]. The Court disagrees. The ALJ's decision is very thorough and appears to include as many observations as possible. From the Court's perspective, the ALJ did not pick and choose only those facts that hurt Ms. Brown's disability claim.

That said, the Court found one statement to be particularly troubling. In his decision, the ALJ wrote that he found the letters from Ms. Brown's employer, friends, and mother "to be similar to the claimant's reports, and . . . [to] add little information, particularly in light of their interest in the outcome. Therefore, the undersigned has afforded minimal weight to these opinions." R. 30–31.[8] While it obviously is true that Ms. Brown's mother has a personal interest in the outcome, she has the closest relationship to Ms. Brown and is in the best position to corroborate or contradict Ms. Brown's reports. Further, none of the other individuals necessarily has an interest in the resolution of this case, and the fact that the descriptions in their letters are similar to Ms. Brown's complaints tends to support Ms. Brown's credibility. It is not clear to this Court what "minimal weight" means in this context—were the comments given any weight at all, or were they simply discounted because of the relationship of the authors to Ms. Brown? Whether or not the Court's concerns about the treatment of the letters would be sufficient to justify remand on its own, since this case is being remanded for other reasons, the Court requests that the ALJ consider these letters again and describe whether, on their merits, they might deserve more weight.

---

[8] To be more accurate, the ALJ did not state that he looked at the employer's letters but only mentioned the other ones on file. The Court assumes that the ALJ reviewed all of the letters but misstated their sources. Since the Court is remanding this issue for other reasons, the ALJ is instructed to ensure he reviews (and discusses his review of) the employer's letters as well.

### D. New Evidence

Ms. Brown's final argument is that the Appeals Council erred when it failed to order a remand for consideration of new evidence that she submitted after the hearing and when it failed to include such evidence in the administrative record for this Court's review. The Appeals Council must "consider evidence submitted with a request for review if the additional evidence is (a) new, (b) material, and (c) related to the period on or before the date of the ALJ's decision." *Chambers v. Barnhart*, 389 F.3d 1139, 1142 (10th Cir. 2004) (citation, internal quotation marks, and alterations omitted); *see also* 20 C.F.R. § 404.970(b). Whether evidence qualifies as new, material, and chronologically relevant is a question of law subject to de novo review. *See Chambers*, 389 F.3d at 1142. If the evidence does not qualify under those standards, it plays no further role in the judicial review of the Commissioner's decision. *Id.* However, if it does qualify and if the Appeals Council considered it upon request for appellate review (regardless of whether review was ultimately denied), it becomes part of the administrative record. *Id.* Finally, if the evidence qualifies but it was not considered by the Appeals Council, the case should be remanded. *Id.*

After receiving the ALJ's denial of her claim, Ms. Brown filed for review from the Appeals Council. She asked that the Council review a number of medical records dated July 2012 through January 2013. [*See* ECF Nos. 13-1–13-3]. The Appeals Council reviewed this new evidence but ultimately found that it was unrelated to the period on or before the date of the ALJ's decision, July 5, 2012. R. 2. In effect, it did not include these new medical records in the administrative record that appears before this Court. However, Ms. Brown attached the records to her opening brief, and the Court has reviewed them in turn. The question before the Court is whether these medical records are new, material, and related to the period on or before July 5,

2012.  While the dates on the records are not dispositive, they constitute a relevant factor for the third prong of the test.

The first medical record is dated July 13, 2012 and shows that Ms. Brown went to see Ms. Holgorsen for a refill of albuterol (a medication used to treat respiratory problems), to check her cholesterol, and to report feeling "more depressed."  [ECF No. 13-1 at 1].  Ms. Holgorsen increased Ms. Brown's Prozac to 20mg and suggested that Ms. Brown seek counseling.  *Id.* at 2. Nothing in this medical record suggests that it relates to a time period on or before July 5, 2013. Instead, Ms. Brown was presenting with increased (or new) symptoms of depression.

The second record is a "Med-9" form from the Colorado Department of Human Services completed by Ms. Holgorsen.  [ECF No. 13-2].  The form is dated November 27, 2012 and it asserts that Ms. Brown is disabled to the extent that she is unable to work at any job for a total period of six or more months due to a physical or mental impairment that is disabling.  *Id.* at 1–2. Ms. Holgorsen diagnoses Ms. Brown with a traumatic brain injury stemming from her motor vehicle accident as well as cognitive impairment.  *Id.* at 2.  She discusses the fact that Ms. Brown has seen numerous specialists, such as Dr. Healey, but that in spite of rehabilitation attempts she "continues to be impaired and unable to sustain gainful employment and also is unable to live alone."  *Id.*  While the form appears to be relevant, it does not contain new information.  In particular, Ms. Holgorsen seems to be making her determination based on a recitation of Ms. Brown's previous medical care and those providers' respective opinions.  (Notably, Ms. Brown only began seeing Ms. Holgorsen in March 2012, and yet the onset date is indicated as December 2010.)  In addition, the form is arguably not related to the time period on or before July 5, 2012. None of the medical records in the administrative record (i.e., from on or before July 5, 2012) from Ms. Holgorsen's office concern Ms. Brown's cognitive functioning.  Therefore, there is no

basis for the Court to believe that this document reflects any new information relating to Ms. Brown's disability claim that arose on or before July 5, 2012.  If anything, the form reflects Ms. Holgorsen's opinion regarding Ms. Brown's previous medical care, possibly taken in conjunction with post-July 5, 2012 observations.

The third piece of new evidence is dated November 26, 2012 and it is entitled "Mini Mental Status Assessment."  [ECF No. 13-3].  The medical record reflects an evaluation with Joan Fitzgerald, MS, LPC, that led to a primary diagnosis of major depressive disorder along with secondary diagnoses of posttraumatic stress disorder and panic disorder without agoraphobia.  *Id.* at 2.  According to the evaluation, Ms. Brown presented seeking therapy for symptoms of depression.  *Id.* at 8.  In turn, Ms. Fitzgerald provided a treatment plan to help Ms. Brown meet her goals.  *Id.* at 13.  The record also reflects that Ms. Brown reported having auditory hallucinations where she fights with ghosts and screams in her sleep, *id.* at 4, as well as panic attacks consisting of heart palpitations, sweating, shaking, shortness of breath, chest pain/discomfort, nausea, and fear of dying, *id.* at 13.  Ms. Brown's first two diagnoses are not new information.  And while the last diagnosis—panic disorder—is new and material, nothing in the record suggests that it relates to a time period on or before July 5, 2012.  The reported hallucinations suffer from the same defect as the panic disorder.

The final medical record is dated January 15, 2013 and is entitled "Initial Diagnostic Interview."  [ECF No. 13-3 at 17].  The consultation was with Mary Bobye, APRN-BC, and consisted of a 60 minute face-to-face interview in which Ms. Brown spoke about her then-current conditions, including a comment that her "memory is getting worse."  *Id.*  The report indicates that Ms. Brown had suicidal thoughts six months earlier and reached out for help at that time, *id.*, which would explain the July 13, 2012 appointment with Ms. Holgorsen where Ms.

Brown reported feeling "more depressed."  Further, Ms. Brown reported that she "sometimes hears her mother calling her in the middle of the night, and she feels her body floating at times." *Id.*  She added that she feels "anxious a lot" and "like she should sleep sitting up because it feels like a ton of bricks on her chest."  *Id.*  Ms. Bobye diagnosed Ms. Brown with *severe* traumatic brain injury and depressive symptoms that "do not seem well controlled."  *Id.* at 19.  She also diagnosed her with bronchitis.  *Id.*  Once again, the Court finds that though this evidence is new and material, it does not relate to the period on or before July 5, 2012.  For instance, on or before July 5, 2012 Ms. Brown was typically diagnosed with mild traumatic brain injury.  Overall, the report indicates more serious symptoms and even some new symptoms compared to those that existed on or before July 5, 2012.

For the foregoing reasons, the Court affirms the decision of the Appeals Council not to include this new evidence in the administrative record.  As the Appeals Council noted, Ms. Brown is free to reapply for disability benefits and to include this new evidence in her application.

## ORDER

The case is REVERSED and REMANDED to the ALJ for further findings consistent with this opinion.

DATED this 20th day of May, 2014.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge